## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DARRELL HARDENBURG,

      Plaintiff,

v.                                 Case No. 11-15630
                                       Hon. Lawrence P. Zatkoff

DUNHAM'S ATHLEISURE CORPORATION,

      Defendant.

_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on August 9, 2013

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [dkt 24]. The Motion has been fully briefed. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(e)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted. For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

### A. FACTUAL BACKGROUND

Plaintiff Darrell Hardenburg ("Plaintiff") was hired by Defendant Dunham's Athleisure Corporation ("Defendant") as an accounts payable clerk in October of 1997. Plaintiff was supplied with Defendant's Associate Handbook, which, among other things, expressed that Defendant had a company

policy prohibiting discriminatory conduct and harassment.  The handbook also provided a reporting mechanism for victims or witnesses of discriminatory conduct or harassment as follows: the victim or witness notifies Defendant by either (1) informing a supervisor or manager; (2) informing a department head; (3) informing the Director of Human Resources; or (4) calling the alert hotline.  If the victim or witness believes that matter remained unresolved, he or she must contact the Senior Vice President of Human Resources.  Plaintiff acknowledged that he read and fully understood the policies contained in the handbook, as evidenced by his signature on the "Associate Handbook Receipt" page.[1]

Plaintiff's duties as an accounts payable clerk comprised processing/retailing/updating vendor invoices (collectively referred to as "processing invoices"), processing store receiving paperwork ("processing store paperwork"), and opening the mail.  The invoices were divided among four accounts payable clerks, with Plaintiff being responsible for vendors S–Z.  Likewise, the task of processing the store paperwork was divided among the four clerks.

In approximately 1999, Plaintiff transitioned into an auditing position (*i.e.*, a second position) which required auditing vendor invoices.  Plaintiff felt this assignment to be "more stressful" than his initial job.  Late in 2006, Plaintiff again transitioned into an "extremely stressful" position (*i.e.*, a third position) where his primary duties included matching invoices to receipts and researching problems with Defendant's distribution center.

Plaintiff suffered a stroke on July 1, 2008, and remained off work for a number of weeks.  According to Plaintiff, he is now cognitively deficient as a result of the stroke.  On August 11, 2008, Plaintiff returned to work on a part-time basis.  Plaintiff and  Lynette Kelley ("Kelley")—Plaintiff's direct supervisor—agreed that Plaintiff would return to his first assignment as an accounts payable clerk, but with reduced responsibilities to facilitate his assimilation back to work and to accommodate his part-time

---

[1] Plaintiff also read and signed Defendant's "Discriminatory/Harassment-Free Work Place Policy" form on January 21, 1999.  This form mirrors in substance the discrimination and harassment policies found in the handbook.

schedule.  Specifically, Plaintiff's job duties only entailed processing vendor invoices A–E.  Although processing store paperwork was a duty normally assigned to an accounts payable clerk, Plaintiff was relieved of that responsibility in the interim.

Plaintiff was cleared by his doctor to return to full-time status on September 15, 2008.  Plaintiff gradually attempted to "[take] on more responsibilities" of his initial position, such as opening the mail. Plaintiff was, however, unable to process store paperwork subsequent to his stroke—this responsibility was eventually shouldered to the other three similarly-situated accounts payable clerks.  Plaintiff admitted during his deposition that, although he hoped that he could return to processing this paperwork after his stroke, such a goal was unrealistic because Plaintiff struggled to maintain pace with his already-reduced responsibilities.

An employee evaluation of Plaintiff dated February 26, 2009, notes, among other things, that Plaintiff's invoices were accurate; that Plaintiff must improve his quantity of work as he "does not come close" to finishing his assigned tasks; that Plaintiff "continued to fall behind in his responsibilities;" that Plaintiff cannot complete the same quantity of work as the other accounts payable clerks; and that the other accounts payable clerks completed Plaintiff's  share of processing store paperwork.[2]  This evaluation form was signed by Plaintiff, Kelley, and Joan Long, Defendant's Vice President and Controller.

On August 25, 2009, Kelley approached Plaintiff about some overdue invoices.  According to Kelley, Plaintiff became upset, stated that he was disabled, and explained that his disability prevented him from doing the "same amount of work as everyone else."  Plaintiff also threatened to sue Defendant for discrimination.   In response to Plaintiff's meeting with Kelley, Plaintiff met with Jan Rieckhoff ("Rieckhoff"), Defendant's Director of Human Resources, and Dan Cieslak ("Cieslak"), Defendant's

---

[2] In March 2009, Defendant circulated an e-mail providing official notice that processing store receiving paperwork was redistributed among Plaintiff's co-clerks.

Senior Vice President of Human Resources, on September 17, 2009.  The purpose of this meeting was two-fold: (1) to address Plaintiff's "outburst" on August 25;[3] and (2) in response to Plaintiff's claim of disability, to determine if any type of accommodation(s) could be made to help Plaintiff adequately perform his job.  Notably, Rieckhoff and Cieslak told Plaintiff to "think about" how Defendant could further accommodate him (aside from a change in job positions and already-reduced duties), and to follow-up with either Rieckhoff or Cieslak with any suggestions or proposals.  Plaintiff failed to do so.

A second evaluation of Plaintiff was drafted on April 15, 2010.  Of import, the evaluation states that Plaintiff's productivity is "well below the accounts payable department standards;" that he consistently fails to complete his assigned work; that portions of his assigned tasks must be shifted to other clerks to meet deadlines; that Plaintiff rarely communicates when he falls behind on assigned tasks; and, overall, that Plaintiff's quantity of work did not improve since his last evaluation.  Plaintiff likewise signed this evaluation.

Plaintiff reviewed the substance of his second evaluation with Kelley and Rieckhoff on or about May 14, 2010.  Rieckhoff reminded Plaintiff that he had not yet proposed any further accommodations that Defendant could provide.  Rieckhoff also reiterated that Plaintiff's "current situation of reduced workload/non-performance could not continue."  As a byproduct of this meeting, it was determined that Kelley would meet daily with Plaintiff to help him prioritize his work and to provide suggestions on how to be more efficient.  Kelley and Plaintiff both agreed that these meetings generally kept Plaintiff "on task."

During the course of Plaintiff and Kelley's regular meetings, she noticed a few areas in which Plaintiff could improve his productivity.  Kelley suggested that Plaintiff not highlight the different fields on the invoices or check off every item on the purchase orders.  Kelley would later testify, "I told him to try not doing that, maybe that would help him."  The suggestions, according to Kelley, would "help him

---

[3] Plaintiff admitted that he "probably" or "may" have overreacted to Kelley's questioning on August 25.

have more time to . . . process more invoices."  On the other hand, Plaintiff testified that unless he highlighted the invoices and checked-off the purchase orders, he "could not keep track of what [he] had to be doing."

Plaintiff was officially terminated by Defendant on January 4, 2011, because his "quantity of work ha[d] not improved since his last review."  The form states Plaintiff's "productivity remain[ed] well below the accounts payable department standards[;]" "he consistently fail[ed] to complete even [his] reduced responsibilities[;]" and he "regularly d[id] not complete all of his assigned work[.]"  The evaluation concludes by stating: "[Plaintiff's] employment will be terminated since previously noted performance deficiencies were not corrected and maintained."  Plaintiff, Kelley, and Rieckhoff signed this form, as all were present at the termination meeting.

Additionally, Rieckhoff drafted notes from the January 4, 2011, meeting, which explain as follows:

> When asked how he thought he had been performing since we talked last, [Plaintiff] at first stated he was doing ok and he was caught up.  I reminded him we were very slow at this time of the year, and that [Kelley] got involved and got [Plaintiff] caught up in September. However, since we spoke in April, until September, [Plaintiff was] not caught up.  [Plaintiff] agreed.
>
> [Plaintiff] stated he wished we would have terminated his employment back when he first returned and it was obvious he couldn't do the job.[4]  I told him we wanted to give him every opportunity to succeed, and that we were very patient, but we could no longer keep him in his position. By giving [Plaintiff] this much time he was able to keep getting full pay and benefits that much longer.  So while he wishes we would have termed [sic] him back then we were trying to be fair and give him the

---

[4] At his deposition, Plaintiff provided the following testimony:

> A.     Of course I wish I was terminated, I could have started this whole process months before.
>
> Q.     What process?
>
> A.     Suing for discrimination.

5

opportunity to do the job. [Plaintiff] agreed that was another way of looking at it.

[Plaintiff] stated he appreciated us putting him into his old position when he returned (from his medical leave). I reminded him we didn't just put him back in his old position but also shifted many of the responsibilities of the position to others, so he was given a reduced version of the old position. And he was not completing the reduced workload.

[Plaintiff] stated he would call or email if he had any other questions, he said he had to comprehend all this. He was not emotional during the meeting as he had been in past meetings.

Since his termination, Plaintiff has not obtained—or applied for—another job. Plaintiff is, however, currently collecting social security disability benefits and unemployment benefits.

Plaintiff filed a one-count Complaint against Defendant alleging "violations of the Americans With Disabilities Act." Presently before the Court is Defendant's Motion for Summary Judgment, which seeks dismissal of Plaintiff's lawsuit.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

6

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'–that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

The Americans with Disabilities Act ("ADA") mandates that "no covered entity shall discriminate against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). A qualified individual means, "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111.

A plaintiff can establish a *prima facie* case of discrimination under the ADA through either direct or circumstantial evidence. *See Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc). *See also Roetter v. Michigan Dept. of Corrs.*, 456 F. App'x 566, 569 (6th Cir. 2012). "'[I]f the

plaintiff has direct evidence that the employer relied on his or her disability in making an adverse employment decision, or if the employer admits reliance on the handicap:

> (1) The plaintiff bears the burden of establishing that he or she is 'disabled.'
>
> (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation.
>
> (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.'"

*Roetter*, 456 F. App'x at 569 (quoting *Monette*, 90 F.3d at 1186).

If the plaintiff seeks to establish discrimination on the basis of circumstantial evidence, however, the *McDonnell Douglas* burden-shifting framework applies. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) and *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259 (1981)). A plaintiff must first establish a prima-facie case under this framework by showing that: (1) he was disabled; (2) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) his employer knew or had reason to know of his disability; and (5) either the position remained open or a non-disabled person replaced him. *Gecewicz*, 683 F.3d at 321. Once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to offer a legitimate, non-discriminatory reason for its action. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). If the employer provides a legitimate, non-discriminatory reason, the burden shifts back to the employee to show that the employer's proffered

reason is pretextual. *Id.*   Under the *McDonnell Douglas* framework, the plaintiff retains the ultimate burden of persuasion at all times.  *Monette*, 90 F.3d at 1186–87.

It is not entirely clear whether Plaintiff's ADA claim is based on direct or indirect evidence. Irrespective of that, Plaintiff maintained the burden under *either* test to prove that he was "otherwise qualified" for his position with or without reasonable accommodation.  Based on all the evidence before the Court, Plaintiff's claim must fail as no reasonable juror could find that Plaintiff was a qualified individual with or without accommodation within the meaning of the ADA.

## A. QUALIFIED INDIVIDUAL WITH OR WITHOUT REASONABLE ACCOMMODATION

The ADA defines a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  Thus, an initial issue in this case is whether, as Defendant claims, processing store paperwork and processing vendor invoices are "essential functions" of an accounts payable clerk.

### i. Essential Functions

To determine whether particular job functions are essential, the ADA instructs that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8)

The Sixth Circuit has explained that the determination of whether a job function is essential should be based on "more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved."  *Hall v. U.S. Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988).  According to the federal regulations interpreting the ADA, "essential functions" refer to job duties that are "fundamental" rather than "marginal."  29 C.F.R. § 1630.2(n)(1).  Factors to consider

when determining whether a job function is essential to the position include: (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs. *Keith v. County of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013) (citing *id.* § 1630.2(n)(3)).

In support of its position, Defendant offers Kelley's deposition testimony wherein she states that such duties are, indeed, "essential job functions." Moreover, Defendant attempts to further amplify the importance of processing store paperwork by citing to Kelley's affidavit: "Unlike the other three accounts payable clerks performing *the same type of assignment* as [Plaintiff], he did not have the responsibility for processing the paperwork for [Defendant's] stores, which normally took two to three days per month." Finally, Defendant relies on the following three documents, all of which allegedly strengthen its position: (1) a generic list detailing the duties of an accounts payable clerk, which includes processing vendor invoices and processing store paperwork; (2) a November 25, 2009, form that describes the responsibilities of the four similarly-situated accounts payable clerks—including Plaintiff—illustrating that: one of Plaintiff's two listed duties was "invoices," while the other three clerks were not only required to process invoices but were also each responsible for processing store paperwork for approximately 50 of Defendant's stores; and (3) a September 2010 document that describes, and discerns, each of the four accounts payable clerks' job duties—Plaintiff's responsibilities comprised, among others, multiple tasks associated with processing invoices and, in similar respect to the November 25, 2009, form, demonstrated that the other three clerks took on all the store paperwork duties.

Remarkably, Plaintiff does not address Defendant's argument that processing store paperwork and processing invoices are essential functions of an accounts payable clerk. Although "determination of whether a given function is 'essential' within the meaning of the ADA and regulations promulgated

thereunder is typically a question of fact[,]" *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998) (citation omitted), Plaintiff still must make an affirmative showing with proper evidence at the summary judgment stage in order to contest—or defeat—Defendant's argument on this point, *see Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Because Plaintiff's response brief is silent on this issue and fails to raise a debatable question of fact, the Court concludes that processing store paperwork and processing invoices were essential functions of Plaintiff's accounts payable clerk position.

### ii. Otherwise Qualified[5]

Having determined that processing invoices and store paperwork were essential functions, the Court next considers whether or not Plaintiff was otherwise qualified to perform these functions, with or without reasonable accommodation. If Plaintiff was not qualified, then his ADA claim is without merit.

Though inartfully pled, it appears that Plaintiff's ADA claim theorizes that he was "otherwise qualified" to be an accounts payable clerk *with* reasonable accommodation: "That upon returning to work, due to the stroke Plaintiff requested reasonable accommodation for his disability[,]" and "[t]hat Defendant repeatedly refused to honor Plaintiff's request for accommodation, and failed to engage in the interactive process as it relates to Plaintiff's disability." Dkt. 1, at ¶¶ 16, 19. So, Plaintiff's theory will have legal bite if he can offer evidence (1) that he was qualified to be (*i.e.*, could perform the essential functions of) an accounts payable clerk, and (2) that he proposed a reasonable accommodation to account for his disability. After reviewing the record, the Court will grant Defendant's motion as Plaintiff fails to offer evidence sufficient to withstand summary judgment.

As noted above, an individual is "otherwise qualified" if he or she can *perform* the "essential functions" of the job. 42 U.S.C. § 12111(8). Plaintiff's ADA claim fails on this basis alone. Pointedly, Defendant argues that Plaintiff was unable to process store paperwork (*i.e.*, the first essential job function). According to Kelley's affidavit, Plaintiff never regained this responsibility after his stroke and,

---

[5] There is no dispute between the parties that Plaintiff was disabled under the ADA.

eventually, his stores were assigned to the other three clerks.  Defendant also relies on the February 26, 2009, evaluation, which reveals that Plaintiff "currently cannot find the time to do store receiving paperwork" and "the rest of the department is forced to help . . . ."  Notably, Plaintiff signed this evaluation thus apparently consenting to the accuracy of, or at the very least acknowledging, its contents.

In common pattern, Plaintiff does not address—much less refute—the merits of Defendant's argument on this issue.  In fact, Plaintiff's own admissions during deposition prove to be fatal here.  Specifically, Plaintiff testified as follows:

> Q.   And were you responsible for a certain number of stores?
> A.   No, I was only doing vendors A through E.
> Q.   And that store responsibility that you described when you were first hired?
> A.   I was not - - I had not taken that on yet.
> Q.   Okay.  Did you at some point take that on again?
> A.   No, I did not.
>
> . . .
>
> Q.   Correct.  You state there - - it says there that switching jobs was okay when you returned and you're not doing store receivers.  That's all accurate, correct?
> A.   Correct.

Dkt. 24, Ex. 1, at pp. 41, 56–57.  Further, Plaintiff's testimony crystalizes why he was incapable of performing this job function:

> Q.   Did you want that responsibility [*i.e.*, store paperwork]?
> A.   That was something I was hoping I could take on, but it didn't look like that was going to happen.
> Q.   Because you couldn't keep up with the duties you were doing?
> A.   Correct.

*Id.* at p. 52.  Thus, no reasonable juror could disagree that Plaintiff could not perform the essential function of processing store paperwork with or without reasonable accommodation.

Defendant next argues in support of summary judgment that Plaintiff "was not able to keep up . . . with processing vendor invoices" (*i.e.*, the second essential job function).  For this assertion, Defendant

relies on the two evaluation forms recounted above—dated February 26, 2009, and April 15, 2010—which collectively describe that Plaintiff "takes too long to process his assigned invoices;" that Plaintiff "does not come close to completing his assigned responsibilities;"[6] that Plaintiff "cannot complete the quantity of work as the other accounts payable clerks are able to complete;" and that "often portions of [Plaintiff's] assigned tasks must be shifted to others to meet deadlines."  Importantly, the latter dated evaluation depicts Plaintiff's lack of improvement: "[Plaintiff's] quantity of work has not significantly improved since his last review."  And, again, these evaluations bear Plaintiff's signature.

Defendant further relies on Plaintiff's termination review that states, because Plaintiff had offered no signs of improvement, his "employment will be terminated since previously noted performance deficiencies were not corrected and maintained."  Moreover, Kelley's deposition and affidavit testimony reveals that Plaintiff could not "keep his work current" and that "many" of Plaintiff's duties had to be shouldered by the other clerks,[7] all facts which lend credence to the substance of the evaluations/termination review.

Finally, Defendant offers a "2009 Accounts Payable (Product)" form that measured accounts payable clerks' productivity based on the number of processed invoices.  For the year 2009, Plaintiff was assigned vendors A–E.  This form illustrates that Plaintiff entered 2,712 of the 8,042 invoices for which he was responsible, equating to a productivity level of approximately 34%.  By contrast, Plaintiff's three co-clerks had approximate productivity levels of 70%, 90%, and 100%.

In attempting to refute that evidence, Plaintiff offers only a conclusory statement that "he was doing more work and was more productive that his counterparts."  Yet Plaintiff produces no evidence—by way of affidavit, evaluations, productivity calculations, or otherwise—to support this contention.  Even more damaging, the majority of the record evidence before the Court directly contradicts Plaintiff's

---

[6] Plaintiff's assigned responsibilities after his stroke chiefly involved processing invoices (or, in other words, only one of his essential job functions).  This fact was confirmed by Plaintiff at his deposition.

[7] *See supra*, note 6.

statement, particularly the "2009 Accounts Payable (Product)" form, which shows—as one example—that Plaintiff's efficiency fell considerably short when compared to his co-clerks.

The Court is cognizant, however, that during his deposition Plaintiff testified that his co-clerks "had more responsibilities, but maybe not the same quantity." When asked to explain that statement, Plaintiff further testified that, "[W]hen I first came back from my stroke I had significantly more percentage of the invoices coming in than the other clerks did." The Court, however, considers this of little persuasive value for two reasons.

First, Plaintiff offers nothing to corroborate this and, importantly, the 2009 productivity form belies his deposition testimony. In fact, the form demonstrates that, while Plaintiff was responsible for 27% of the in-coming invoices for that year, the other three clerks shared equal or only slightly less responsibility (27%, 24%, and 21%, respectively). Second, and adding more confusion, Plaintiff also testified that, "I cannot do the same amount of work as everybody else[,]" and affirmatively agreed during his deposition that he "couldn't keep up with the duties [he was] doing." Thus, it appears to the Court that Plaintiff cannot decide whether or not he "had more responsibilities" than his counterparts.

In sum, Plaintiff's bald assertions amount to nothing more than a "scintilla of evidence." *Anderson*, 477 U.S. at 252. Plaintiff cannot create a genuine issue of material fact and defeat summary judgment merely by summarily denying Defendant's arguments when those arguments are backed with record evidence. *See Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989) ("So long as the movant had met its initial burden of demonstrat[ing] the absence of a genuine issue of material fact, the nonmoving party then must set forth specific facts showing that there is a genuine issue for trial."). Therefore, the Court holds reasonable minds could not differ as to whether Plaintiff was "otherwise qualified" because he could not perform the essential functions of an accounts payable clerk.

### iii. Reasonable Accommodation

Even assuming, *arguendo*, that Plaintiff could perform either essential function *with* an accommodation—which is what he argues—his ADA claim still fails as a matter of law because Plaintiff cannot dispute (1) that he failed to request further reasonable accommodation(s), or, alternatively, (2) that Defendant provided him reasonable accommodations.

Under the ADA, an employer must make "reasonable accommodations to the known physical and mental limitations of an otherwise qualified individual with a disability."   42 U.S.C. § 12112(b)(5)(A).  The ADA defines "reasonable accommodation" to include, among other things "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . [or] other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation and show it is "objectively reasonable."  *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 870 (6th Cir. 2007).  In defining what is reasonable, the Sixth Circuit "has described the employee's initial burden on this issue as showing 'that the accommodation is reasonable in the sense both of efficacious and of proportional to costs.'" *Keith*, 703 F.3d at 927 (quoting *Monette*, 90 F.3d at 1183) (citation omitted).  Furthermore, the plaintiff has the burden of proving that he will be "capable of performing the essential functions of the job with the proposed accommodation."  *Monette*, 90 F.3d at 1184.

The Court questions whether Plaintiff or Defendant initiated discussions in relation to what accommodations could be provided to Plaintiff to combat his disability.  The record is not clear. Nonetheless, the Court will draw all reasonable inferences in favor of Plaintiff and concludes that when Plaintiff presented his doctor's note to Defendant—after the stroke and upon returning to work—such action constituted a request for accommodation.  Because a request for accommodation was made,

15

Defendant's statutory obligation to reasonably accommodate Plaintiff's disability was triggered. 42 U.S.C. § 12112(b)(5)(A); *Gaines v. Runyon*, 107 F.3d 1171, 1178 (6th Cir. 1997).

In similar vein, however, any attempt by Plaintiff to argue he was not reasonably accommodated is disingenuous. The Court finds Plaintiff was provided, at a minimum, the following accommodations after his stroke: (1) he was re-assigned to his initial position as accounts payable clerk; (2) his responsibilities were reduced to the extent that his primary task entailed processing invoices; (3) from August 11 to September 15, 2008, Plaintiff was on part-time status; (4) he was not responsible for processing store receiving paperwork while part-time; (5) on March 31, 2009, after Plaintiff had returned to full-time status, his store paperwork duty was officially tendered to the other three clerks; (6) Plaintiff's reduced job duties continued after returning to full-time status; and (7) Kelley began meeting with Plaintiff in May 2010 to help him prioritize his responsibilities and to provide him suggestions on being more efficient.

As is clear from the record, Defendant provided myriad *reasonable* accommodations to Plaintiff to offset his disability. Moreover, an employer need not provide the accommodation that the employee requests or prefers. Instead, an employer—like Defendant—retains the "ultimate discretion" to choose another effective accommodation. *Hankins v. The Gap*, 84 F.3d 797, 800–01 (6th Cir. 1996). Plaintiff, then, was not entitled to a *particular* reasonable accommodation if another reasonable accommodation was provided—as was the case here. *See id.*; 20 C.F.R. § 1630.9(d).[8] As such, Plaintiff has not demonstrated a genuine issue of material fact that Defendant failed to provide him reasonable accommodation as mandated by the ADA.

Plaintiff endeavors to manufacture a dispute regarding accommodation with the following statements: "[Plaintiff] requested the accommodations of making notations on invoices, the ability to

---

[8] Plaintiff has offered no evidence—or argument—demonstrating that Defendant's offered accommodations were inadequate. *See Trepka v. Board of Educ.*, 28 F. App'x 455, 460 (6th Cir. 2002) (citing to *Gaines*, 107 F.3d at 1178).

speak with his coworkers, and the use of a highlighter to assist with concentration. The Defendant . . . rejected these accommodation requests and offered no alternative reasonable accommodation." Dkt. 25, p. 19. Plaintiff apparently misconstrues the record and his statement is, at best, misplaced.

First, as a byproduct of Plaintiff's meetings with Kelley, she noticed that Plaintiff was expending a good amount of time notating and or highlighting purchase orders and invoices, and communicating his point of view to co-workers on certain departmental issues.[9]  These things, Kelley opined, were not required and hindered Plaintiff's ability to keep his work current.  To help Plaintiff prioritize his responsibilities, Kelley *suggested* that Plaintiff "try" to refrain from notating, highlighting, and speaking to co-workers.  And, Kelley provided these suggestions, in part, because Plaintiff had failed—despite being asked by Kelley, Rieckhoff, and Cieslak—to offer any additional accommodations (aside from ones listed above) that would enable him to be more productive.  Even if the Court were to construe these suggestions as "denied accommodations," Plaintiff offers no evidence to prove—or raise a debatable issue—that these "accommodations" would have enabled him to perform the essential functions of his job. *See Hoskins v. Oakland Cty. Sheriff's Dept.*, 227 F.3d 719, 731 (6th Cir. 2000) (affirming summary judgment for the defendants, in part, because the plaintiff failed to create a genuine issue of material fact as to whether she could perform the essential functions of the deputy one position with reasonable accommodation).

Second, Plaintiff ignores the burden sounding from the ADA that requires him to first propose a reasonable accommodation.  As previously mentioned, Kelley, Rieckhoff, and Cieslak all attempted to solicit from Plaintiff additional proposed accommodations that would better enable him to perform his duties.  Yet, Plaintiff offered nothing in return, a fact which was confirmed at his deposition:

> Q.    Did you ever go to [Cieslak] and [Rieckhoff] with any
>       suggestions on how to help you perform you job?

---

[9] There is no evidence before the Court to suggest that Plaintiff even proposed these as "reasonable accommodations."  In contrast, Kelley was merely pinpointing actions that could save Plaintiff time.

A.      No, I did not.

Dkt. 24, Ex. 1, p. 31.  In sum, because (1) Plaintiff was provided multiple reasonable accommodations by Defendant; (2) his "denied accommodation" argument misconstrues the facts and the record; and (3) Plaintiff failed to request any additional accommodations, no reasonable juror could find that Defendant violated the ADA's accommodation provision.

## B. INTERACTIVE PROCESS

Plaintiff also claims that Defendant did not engage in the "interactive process as it relates to Plaintiff's disability."  Dkt. 1, at ¶ 19.  The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]."  29 C.F.R. § 1630.2(o)(3).  The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.*  Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc)).  Even though the interactive process is not described in the ADA's statutory text, "the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871.

Any argument that Defendant did not attempt to identify reasonable accommodations with good faith is belied by the record and is without merit.  When Plaintiff first returned to work after his stroke, it is undisputed that Kelley met with Plaintiff to discuss ways to accommodate Plaintiff's disability.  The outcome: Plaintiff acquired part-time status, temporarily; and his responsibilities were drastically reduced, permanently.  When Plaintiff failed to keep his reduced workload current, it was Kelley, Rieckhoff, and Cieslak who asked Plaintiff if there were any additional accommodations Defendant could provide.  In

the end, Plaintiff remained silent.  The record before the Court reveals not even "a scintilla of evidence" that Defendant acted in anything but good faith.  Thus, the Court grants summary judgment to Defendant on this issue.

## C. HOSTILE WORK ENVIRONMENT

Last, to the extent Plaintiff's ADA count also comprises a hostile work environment claim, such claim must fail.  In order to maintain a hostile work environment claim under the ADA, an employee must demonstrate that: (1) he was disabled; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment unreasonably interfered with his work performance; and (5) the defendant employer either knew or should have known about the harassment and failed to take corrective measures.  *Trepka*, 28 F. App'x at 461 (citations omitted).  The Supreme Court has explained that for a plaintiff to have suffered from a hostile work environment, the plaintiff's workplace must have been "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Conduct that is "merely offensive" will not suffice to support a hostile work environment action.  *See id.* at 21.

Plaintiff's claim of hostile work environment is ostensibly based on his interactions with Kelley on August 25, 2009.  According to Plaintiff, Kelley "began humiliating Plaintiff in front of his coworkers" regarding past-due invoices.  Plaintiff further alleges that Kelley "routinely criticize[d] his work and discipline[d] Plaintiff in front of his coworkers," and that Kelley never disciplined "non-disabled employees" except behind "closed doors."  Recalling these events at his deposition, Plaintiff explained: "[Kelley] made a point of pointing out how bad my invoices were in front of everybody else. If I was to be reprimanded, it should have been behind closed doors, not in front of the rest of the department."

The Court finds the record devoid of any inference that Plaintiff was subject to harassment rising to the level necessary for a viable claim.  These bald allegations amount to nothing more than Kelley merely discussing performance related problems with Plaintiff.  *See Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998) ("Conversations between an employee and his superiors about his performance does not constitute harassment simply because they cause the employee distress.").  There is no evidence that Plaintiff was ridiculed or insulted because of his disability to the point that it "permeated" his work environment.  As such, no reasonable trier of fact could find that Plaintiff suffered from a hostile work environment.

## V. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [dkt 24] is GRANTED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
Hon. Lawrence P. Zatkoff
U.S. District Judge

Dated:  August 9, 2013